# COMPOSITE

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | No. 2:18-CR-133 |
| | ) | |
| v. | ) | Judge: Greer/Corker |
| | ) | |
| SCOTT GREGORY ROIX | ) | **FILED UNDER SEAL** |

## PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of
Tennessee ("USATNE"), the United States Department of Justice, Consumer Protection Branch
("USDOJ-CPB"), the defendant, SCOTT GREGORY ROIX, and the defendant's attorneys,
Roger Dickson, Esq., Zac Greene, Esq., and Christopher Kise, Esq., have agreed upon the
following:

1. The defendant will waive indictment and arraignment and plead guilty to an
information charging the defendant with the following offenses:

   (a) Count One – Conspiracy to Commit Health Care Fraud: the defendant
knowingly, intentionally, and unlawfully conspired with one or more other persons to commit
Health Care Fraud in violation of 18 U.S.C. § 1347, and one or more such persons did an act to
effect the object of the conspiracy, all in violation of 18 U.S.C. § 371. The maximum
punishment for this offense is five (5) years' imprisonment, a $250,000 fine, three (3) years'
supervised release, and a $100 mandatory assessment.

   (b) Count Two – Conspiracy to Commit Wire Fraud: the defendant
knowingly, intentionally, and unlawfully conspired with one or more other persons to commit
Wire Fraud in violation of 18 U.S.C. § 1343, and one or more such persons did any act to effect
the object of the conspiracy, all in violation of 18 U.S.C. § 371. The maximum punishment for

Defendant's Initials 

Page 1 of 31

this offense is five (5) years' imprisonment, a $250,000 fine, three (3) years' supervised release, and a $100 mandatory assessment.

2.    In consideration of the defendant's guilty pleas:

(a)    USATNE agrees not to further prosecute the defendant in the Eastern District of Tennessee for any other non-tax criminal offenses committed by the defendant that are related to the charges contained in the information in this case and that are known to USATNE at the time this plea agreement is signed by both parties.

(b)    USDOJ-CPB agrees not to further prosecute the defendant in any district in the United States for any other non-tax criminal offenses committed by the defendant that are related to the charges contained in the information in this case and that are known to USDOJ-CPB at the time this plea agreement is signed by both parties.

3.    The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crimes charged.

4.    As to the scheme contemplated by Count One: In support of the defendant's guilty plea, USATNE and the defendant agree and stipulate to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and USATNE retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

(a)    From on or about June 1, 2015 through on or about April 1, 2018, the defendant conspired with the persons and entities described below (and other persons and entities, including other pharmacies) to implement a scheme and artifice to defraud patients, doctors, health care benefit programs, and pharmacy benefit managers out of not less than

Defendant's Initials _____

$100,000,000 and, in furtherance thereof, caused to be submitted not less than approximately $505,000,000 in fraudulent claims for payment, as further described herein.

## Persons and Related Entities

(b)    The subjects include the following persons and entities:

(i)    The defendant and HealthRight LLC ("HealthRight"). At all times relevant to the conspiracy, the defendant and his partner H.S. owned and controlled HealthRight;

(ii)    SPS Inc., SPS LLC, and SP LLC (these three entities, "S-Pharmacy"), PPM LLC ("PPM"),[1] and the three owners thereof (the "S-Pharmacy Principals"). At all times relevant to the conspiracy, the S-Pharmacy Principals owned and controlled S-Pharmacy and PPM;

(iii)    AOP LLC ("A-Pharmacy"), GP Inc. ("G-Pharmacy"), ZP ("Z-Pharmacy"),[2] and a person known as "Conspirator #4." At all times relevant to the conspiracy, Conspirator #4 controlled A-Pharmacy, G-Pharmacy, and Z-Pharmacy. Conspirator #4 also received all or substantially all of the revenue obtained by those pharmacies as part of the conspiracy; and

(iv)    Numerous other persons and entities (including pharmacies) that the defendant has identified or will identify for USATNE.

## Background

(c)    During the conspiracy, HealthRight was an e-medicine company that provided patients with a means of communicating directly with doctors about medical issues. HealthRight had a legitimate business model and an illegitimate business model. As part of the

---

[1] These are not the real names of these corporate entities.
[2] These are not the real names of these corporate entities.

Defendant's Initials _____

legitimate business model, HealthRight contracted with companies called *locum tenens* (essentially doctor staffing agencies), which in turn contracted with doctors. The doctors that participated in HealthRight's electronic medicine platform (the "care platform") were able to interact with patients via telephone or video conference and write prescriptions for non-controlled substances for patient ailments. HealthRight paid the doctors approximately $25 for each patient "tele-consult" they conducted. In turn, HealthRight charged each patient $55 for the doctor consult, netting $30 in the process. In the event that the doctor authorized a prescription, HealthRight had no interest in which pharmacy the patients selected to fill their prescriptions.

### Summary of the Conspiracy

(d)      HealthRight also had an unlawful and illegitimate business model. The defendant employed this illegitimate business model in furtherance of the conspiracy. The illegitimate business model altered the process described in paragraph 4(c) above in important ways. In the legitimate business model, patients who wanted medical care sought out HealthRight to connect them to doctors for the purpose of obtaining prescriptions for common ailments (like antibiotics). In the illegitimate model, HealthRight deceived patients to create enormous artificial demand for prescription medications that patients were led to believe would provide treatment for their ailment. In the legitimate model, HealthRight charged patients $55 for a telemedicine consult. In the illegitimate model, HealthRight automatically qualified patients for a no-consult and charged patients nothing (because the patients would not pay for medications they did not want) and then sold signed prescriptions to the conspiring pharmacies for approximately $500 each. In the legitimate model, HealthRight did not care whether the patients had health insurance. In the illegitimate model, the patients were automatically disqualified if they did not have health insurance. In the legitimate model, HealthRight was

Page 4 of 31

Defendant's Initials _____

indifferent to whether doctors prescribed medications, which medications were prescribed, or which pharmacy filled the prescriptions. In the illegitimate model, HealthRight took steps to ensure that doctors issued prescriptions, that those prescriptions were for medications pre-selected by the conspiring pharmacies (based solely upon profitability), and that the prescriptions for those medications were delivered immediately by electronic means to the conspiring pharmacies, not allowing patients to choose their own pharmacy. The defendant and HealthRight designed and implemented the illegitimate business model described in this paragraph for the purpose of furthering the conspiracy.

(e)     The defendant and HealthRight knew that the illegitimate business model required that HealthRight engage in a variety of deceptive practices. First, the defendant and HealthRight employed a number of fraudulent techniques to deceive patients to disclose their insurance information to HealthRight. Second, the defendant and HealthRight employed a number of fraudulent techniques to deceive doctors into issuing prescriptions for pre-selected medications. Third, the defendant and HealthRight sold those prescriptions to the conspiring pharmacies in violation of federal law and in violation of Fla. Stat. § 465.185 law (in the case of patients with any insurance, including private insurance).

(f)     The first part of the scheme was designed and implemented by the defendant and HealthRight, but that was only one half of the scheme. The second part of the scheme was designed and implemented by the S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-Pharmacy, G-Pharmacy, Z-Pharmacy and other persons and pharmacies. They depended upon one another, and the defendant and HealthRight conspired with all of them.

(g)     The defendant and HealthRight understood that the conspiring pharmacies and their principals could not submit claims for payment for high-reimbursing prescription

Defendant's Initials _____                Page 5 of 31

medications without first obtaining signed prescriptions for insured patients. As described herein, the defendant and HealthRight developed the illegitimate business model to use HealthRight's care platform to obtain those prescriptions for insured patients. The defendant and HealthRight also understood that they couldn't make any money for the prescriptions unless they sold them to the pharmacies. In effect, because HealthRight was providing the e-consult to the patient at no cost, selling the resulting prescription was the only way for the defendant and HealthRight to make money as part of this scheme.

(h)    Thus, beginning on or about June 2015 and continuing through on or about April 1, 2018, the defendant and HealthRight conspired with the S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-Pharmacy, G-Pharmacy, and Z-Pharmacy, and other persons and pharmacies, to: (i) use HealthRight's care platform to obtain prescriptions that were pre-selected by the pharmacies based upon profitability using a variety of fraudulent techniques; (ii) sell those prescriptions to the S-Pharmacy Principals and Conspirator #4, among others; (iii) submit bills to the health care benefit programs for those prescriptions; and (iv) cause the pharmacies to employ several additional fraudulent techniques (known to the defendant and HealthRight) to ensure that the health care benefit programs continued to pay for those fraudulently-obtained prescriptions throughout the conspiracy.

(i)    The S-Pharmacy Principals and Conspirator #4 selected medications because the S-Pharmacy Principals and Conspirator #4 were able to obtain extraordinarily high reimbursement rates for them by exploiting the difference between their actual acquisition cost and the publicly-reported average wholesale price (each such medication, an "Inflated AWP Medication"). The S-Pharmacy Principals and Conspirator #4 were frequently able to obtain

Defendant's Initials _____

compensation for Inflated AWP medications that was between three and ten times their actual costs.

(j)     During the conspiracy, the defendant understood that the pharmacies obtained this compensation by submitting bills to companies called pharmacy benefit managers ("PBM") that adjudicated prescription claims on behalf of Medicare, TRICARE, Medicaid, Federal Employees' Contribution Act ("FECA"), the Federal Employees Health Benefit Program ("FEHBP"), and private insurance companies. There were many such PBMs, and some of the largest in the country included Express Scripts, CVS Caremark, Optum, and Prime Therapeutics.

(k)     From approximately September 1, 2015 through approximately April 1, 2018, S-Pharmacy and PPM submitted not less than approximately $320,000,000 in fraudulent claims and actually received from the PBMs not less than approximately $81,000,000 from the PBMs for fraudulently-obtained prescriptions for Inflated AWP Medications purchased from the defendant and HealthRight.

(l)     From approximately November 2016 through approximately December 2017, A-Pharmacy, G-Pharmacy, and Z-Pharmacy submitted not less than approximately $185,649,000 in fraudulent claims and actually received from the PBMs not less than approximately $24,495,000 for fraudulently-obtained prescriptions for Inflated AWP Medications purchased from the defendant and HealthRight.

(m)     S-Pharmacy received approximately $1,027,975 from Medicare, $426,929 from TRICARE, $1,021,161 from various state Medicaid programs (including the Medicaid programs for the states of Alaska, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Michigan, Minnesota, Nevada, New Mexico, New York, North

Defendant's Initials 

Page 7 of 31

Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Washington, and West Virginia), $828,297 from FEHBP, and approximately $108,582 from FECA.

(n)     The S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-Pharmacy, G-Pharmacy, and Z-Pharmacy then paid approximately $37,025,000 to HealthRight for those prescriptions in direct violation of federal or state law.   Other persons and pharmacies also paid HealthRight to buy fraudulent prescriptions.

### I - Patient Deception

(o)     During the conspiracy, the defendant caused HealthRight to generate in excess of 100,000 prescriptions for Inflated AWP Medications that it sold to the S-Pharmacy Principals and Conspirator #4 among other persons and entities, as described below in the section entitled "Prescription Brokering."  Each of these signed prescriptions corresponded to a patient with Medicare, Tricare, Medicaid, FECA, FEHBP, or private insurance.

(p)     To generate the enormous number of insurance-covered prescriptions for Inflated AWP Medications, the defendant and HealthRight employed a variety of techniques to deceive patients and induce them into providing their insurance information.  In particular, the defendant and HealthRight: (i) placed deceptive and misleading advertisements on various websites and social media outlets including, without limitation, Facebook and Yahoo!, indicating that HealthRight offered cannabis-based medication and clinical research trials utilizing cannabidiol oil ("CBD oil") or stem cells; (ii) misinformed patients that the Inflated AWP Medications were effective at treating various ailments; (iii) deceived patients into believing that they were speaking with nurses or other practitioners who were engaged in the practice of medicine; (iv) intentionally withheld from patients the exorbitant amounts that would be billed to the patients' insurance for the Inflated AWP Medications; (v) intentionally withheld from

Defendant's Initials 

patients that the pharmacies were paying HealthRight for prescriptions for Inflated AWP Medications; (vi) deceived patients into believing that the prescribed Inflated AWP Medications were custom tailored to their individual needs; (vii) employed intentionally vague and misleading call scripts to induce patients to say "yes" to certain recorded questions to make it appear, falsely, that the patients understood and agreed to receive Inflated AWP Medications; (viii) substituted Inflated AWP Medications without obtaining patient approval or notifying patients of the substitution; and (ix) transferred patient prescriptions for Inflated AWP Medications from one pharmacy to another without notifying patients, among other techniques.

(q)     The defendant knew that many or all of the above techniques were necessary to obtain insurance information from patients. For example, the defendant caused false and misleading advertisements to be placed on various internet sites, including on Facebook and Yahoo!. An example of four of those false and misleading ads is below:






Defendant's Initials _____

(r)     The defendant knew that HealthRight never offered any cannabis-based medication, never offered any clinical trials relating to cannabis or CBD oil, and never offered any trials or medications related to stem-cell therapy. The defendant knew that the above advertisements were plainly fraudulent. The defendant caused HealthRight call center staff to mislead, deceive, and "string" patients along so that the patients believed they would receive CBD-oil, or be enrolled at some point in a cannabis-based or stem-cell based clinical trial. The defendant knew that the whole purpose of the deceptive ads and deceptive calls was to obtain patient insurance information. The defendant also knew that many patients would not have provided insurance information to HealthRight if they understood they would never receive CBD oil or cannabis-based medications or clinical research trials.

(s)     The defendant knew that hundreds or thousands of patients were deceived by the above ads and the subsequent phone calls with the call center staff. As a result of such deception, these patients provided their insurance information to HealthRight, which the defendant and HealthRight used to obtain prescriptions to sell to the pharmacies.

(t)     The defendant also ensured that the call center staff were incentivized to, and did in fact, engage in dishonest and deceptive techniques to obtain insurance information from patients. The defendant incentivized the call center staff through a compensation structure that paid call center employees a bonus each time they were able to obtain insurance information from patients.

(u)     After talking to an initial HealthRight call center employee (the "phase I" call), patients were transferred to a second call center employee for the purpose of providing answers to a series of pre-printed questions regarding the patients' medical history (the "phase II" call).

Page 10 of 31

Defendant's Initials _____

(v)     The defendant caused the phase II employee to identify himself or herself to the patient as a "clinical staff member," "medical assistant," "nurse" or other title that suggested to the patients that the phase II employee was a trained, licensed, and practicing medical professional. In fact, as the defendant knew, none of the phase II employees was actually practicing medicine while employed at HealthRight. During the conspiracy, the defendant and HealthRight explicitly prevented their "medical staff" from practicing medicine and made it clear to the S-Pharmacy Principals and Conspirator #4 that they were *not* engaged in the practice of medicine. The defendant and HealthRight never informed patients of this fact and instead allowed the patients to believe the opposite based upon HealthRight's actions. The defendant understood and intended that this technique caused patients to believe that they were talking to a HealthRight employee who was trained and licensed to practice medicine and *actually was* practicing medicine when in fact no HealthRight employee practiced medicine while employed at HealthRight.

(w)     The defendant admits that tens of thousands of patients were deceived by HealthRight using the techniques described in this section, and that as a result of such deception these patients provided HealthRight with their insurance information. The vast majority of the patients would not have provided their insurance information to HealthRight had HealthRight utilized honest advertising practices and honest call scripts.

(x)     The defendant also ensured that the overwhelming majority (in excess of 95%) of all HealthRight patients who received prescriptions for Inflated AWP Medications *never* spoke with the prescribing doctor and never consulted or interacted in any meaningful way with any person lawfully engaged in the practice of medicine.

Defendant's Initials _____                Page 11 of 31

(y)  Of the tens of thousands of patients deceived by the techniques authorized

by the defendant and implemented by HealthRight, hundreds were located in the Eastern District

of Tennessee, including the following list of patients in the Eastern District of Tennessee:

| Patient | Pharmacy | Approx. Date of Rx | Prescribed Inflated AWP Medications | Amount Billed | Amount Paid |
|---------|----------|--------------------|-------------------------------------|---------------|-------------|
| S.C. | S-Pharmacy | 3/2016 | Lidocaine 5%; Diclofenac 3%; Doxepin 5% | $32,354 | $22,520 |
| L.S. | S-Pharmacy | 6/2016 | Lidocaine 5%; Diclofenac 3% | $49,745 | $32,362 |
| J.F. | S-Pharmacy | 7/2016 | Lidocaine 5%; Diclofenac 3% | $24,876 | $16,890 |
| D.W. | S-Pharmacy | 3/2017 | Lidocaine 5%; Dihydroergotamine | $18,920 | $15,229 |
| J.S. | S-Pharmacy | 3/2017 | Dihydroergotamine; Lidocaine 5%; Diclofenac 3% | $19,704 | $13,419 |
| J.B. | S-Pharmacy | 4/2017 | Lidocaine 5%; Doxepin 5%; Dihydroergotamine; | $21,018 | $17,450 |
| P.O. | A-Pharmacy | 9/2017 | Diclofenac 3%; Fenortho Cap | $18,080 | $5,440 |
| R.W. | A-Pharmacy | 9/2017 | Diclofenac 3%; Lidocaine 5%; Fenortho Cap | $12,291 | $4,707 |
| B.N. | A-Pharmacy | 9/2017 | Diclofenac 3%; Cifrazol Cap | $18,376 | $3,555 |
| T.W. | A-Pharmacy | 10/2017 | Diclofenac 3%; Lidocaine 5%; Fenortho Cap | $23,935 | $9,434 |

(z)  The defendant also caused HealthRight to discount its standard patient

consultation fee of approximately $55 to $0 for every patient contacted by HealthRight about

Inflated AWP Medications because the defendant knew that the patients did not understand that

their information would be used to generate prescriptions that were sold to conspiring

pharmacies.  Through this process, HealthRight created the appearance of demand for Inflated

AWP Medications, but no such demand actually existed.

(aa)  Deceiving patients was only the first step in the conspiracy.  The

defendant also needed to obtain prescriptions from doctors for Inflated AWP Medications for

each patient who had provided his or her insurance information to HealthRight.  Without those

signed prescriptions, the defendant would not be able to meet his end of the prescription

brokering bargain with the S-Pharmacy Principals and Conspirator #4, as described below in the

section entitled "Prescription Brokering."

**II - Doctor Deception**

(bb)  After obtaining patient authorization using the misleading methods

described above, the defendant also caused HealthRight to deceive doctors to authorize

Page 12 of 31

Defendant's Initials _____

Case 2:18-cr-00133-JRG-MCLC *SEALED*  Document 4 *SEALED*  Filed 09/14/18  Page 12 of
31  PageID #: 47
Case 2:18-cr-00140-JRG-CRW  Document 22-1  Filed 07/02/20  Page 13 of 72  PageID #:
2961

medically unnecessary prescriptions for Inflated AWP Medications. To accomplish this, the defendant and HealthRight: (i) misrepresented to doctors that patients had requested specific Inflated AWP Medications by name; (ii) intentionally concealed from doctors that the pharmacies paid HealthRight on a per-prescription basis or split revenue with HealthRight in violation of federal or state law; (iii) intentionally concealed from participating doctors the fact that many patients had stated that the Inflated AWP Medications were ineffective at treating patient ailments; (iv) re-submitted prescriptions for Inflated AWP Medications to different doctors if the first doctor did not authorize a prescription or wrote a prescription for a non-Inflated AWP Medication; (v) designed the care platform in a manner that channeled participating doctors to select an Inflated AWP Medication from a drop-down menu that was pre-populated with a list consisting only of Inflated AWP Medications, all of which were selected by the S-Pharmacy Principals and Conspirator #4 (and others whose identities are known to the defendant); and (vi) misled doctors to believe that many patients had requested 3 automatic refills, among other techniques.

(cc)     The defendant also instructed HealthRight staff to explain to doctors the importance of: (i) writing prescriptions for the Inflated AWP Medications; (ii) authorizing substitutions; and (iii) prescribing the "supplemental therapies" (which also were Inflated AWP Medications selected by the pharmacies).

(dd)     The defendant also caused HealthRight staff to indicate to doctors that patients had requested or were interested in "supplemental medications" like scar creams, migraine medications, or "Durachol" (essentially a multi-vitamin), all of which were Inflated AWP Medications. In response, those doctors wrote thousands of prescriptions for those supplemental therapies that HealthRight, acting at the defendant's instruction, then sold to the

Defendant's Initials _____

Page 13 of 31

pharmacies. In turn, the pharmacies billed those prescriptions to the PBMs. In fact, as the defendant knew, on most occasions, those patients had not requested those supplemental therapies and did not understand that their insurance companies would be billed for them.

(ee) Dr. J.L. was a physician whose practice was located in the Eastern District of Tennessee. From approximately June 1, 2015 through his decision to cease issuing prescriptions through HealthRight's care platform in the summer of 2016, Dr. J.L. authorized thousands of prescriptions for Inflated AWP Medications that the defendant then sold to pharmacies participating in the conspiracy. Those prescriptions resulted in not less than 605 claims paid by the PBMs corresponding to at least 231 patients, many of whom were located in the Eastern District of Tennessee.

(ff) Once the defendant had obtained patient insurance information and corresponding prescriptions for Inflated AWP Medications from the participating HealthRight doctors (including prescriptions written by Dr. J.L.), the defendant caused HealthRight to sell those prescriptions to the S-Pharmacy Principals, Conspirator #4, and others so that they could bill them to the PBMs.

(gg) The defendant understood that selling those prescriptions was in violation of federal law and in violation of Fla. Stat. 465.185 (in the case of patients with any insurance, including private insurance). The defendant also understood that the PBMs required the pharmacies to obtain prescriptions and bill for them in accordance with applicable federal and state laws. The PBMs would not have reimbursed the pharmacies for prescriptions for Inflated AWP Medications if they had known that the pharmacies had purchased them from HealthRight in violation of federal or state law.

Page 14 of 31

Defendant's Initials _M_

### III - Prescription Brokering

(hh)    The defendant caused HealthRight to enter into written agreements for the purpose of selling prescriptions to the pharmacies. Those written "marketing agreements" were designed to conceal the actual prescription brokering arrangement between the parties.

(ii)    HealthRight entered into written "marketing agreements" with S-Pharmacy, PPM, A-Pharmacy, and others involved in the conspiracy. These marketing agreements provided that HealthRight would perform marketing and brand development services on behalf of S-Pharmacy, PPM, and A-Pharmacy in return for a flat fee calculated on a monthly basis determined in advance of each month.

(jj)    Beginning on or around September 2015 and continuing through approximately May 2016, the written marketing agreement between HealthRight and S-Pharmacy required S-Pharmacy to pay HealthRight a monthly fee calculated as $37,650 multiplied by the number of full time employees that HealthRight would dedicate to the S-Pharmacy account in the upcoming month. The agreement also stated: "The parties further agree that the Fee is not based on the value or volume of services generated by HealthRight on behalf of [S-Pharmacy]." The purpose of this agreement was to make it appear that HealthRight had a legitimate business relationship with S-Pharmacy pursuant to which it would provide *bona fide* marketing services, but not be selling prescriptions.

(kk)    In reality, the monthly fee that S-Pharmacy paid to HealthRight during the conspiracy was calculated *only as a function* of the "value [and] volume" of prescriptions for Inflated AWP Medications that HealthRight sent to S-Pharmacy. In fact, the defendant agreed with the S-Pharmacy Principals that they would split the net revenue from successfully billed prescriptions equally; and the defendant caused HealthRight staff to exchange dozens or

Defendant's Initials

hundreds of emails with S-Pharmacy to track the delivery of and billing for prescriptions sent from HealthRight to S-Pharmacy. The defendant, with the assistance of HealthRight staff, also conspired with the S-Pharmacy Principals to create invoices and other documents that made it appear as though the monthly fee was calculated in the manner contemplated by the written marketing agreement when, in fact, the defendant knew that they were sharing revenue with S-Pharmacy.

      (ll)    Beginning around May 2016, the fee provision in the written marketing agreement between S-Pharmacy and HealthRight was changed. From that point forward, S-Pharmacy agreed to pay a flat fee to HealthRight in the amount of $300,000 per week for marketing services.

      (mm)    Around the fall of 2016, the defendant caused HealthRight to enter into a another flat-fee written marketing agreement with PPM, which was controlled entirely by the S-Pharmacy Principals, as further described in the section entitled "Identity Concealment Fraud" below. From that point forward, PPM agreed to pay a flat fee to HealthRight in the amount of $95,000 per week for marketing services.

      (nn)    The HealthRight flat fee agreements with S-Pharmacy and PPM both contained language stating that the fee was not based upon the "value or volume of services generated by HealthRight on behalf of" S-Pharmacy or PPM. However, beginning in May 2016, the defendant had agreed to sell signed prescriptions to S-Pharmacy at a rate of approximately $500 per prescription. PPM joined the agreement on the same terms in October 2016.

      (oo)    Specifically, in May 2016, the defendant actually agreed with the S-Pharmacy Principals that HealthRight would deliver approximately 2,600 signed prescriptions per month to S-Pharmacy in exchange for $300,000 per week.

Defendant's Initials _____

Page 16 of 31

(pp)     On October 10, 2016, the defendant exchanged emails with an S-Pharmacy Principal in which the defendant agreed to deliver approximately 3,400 signed prescriptions per month to S-Pharmacy and PPM (the entity created for purposes of concealing the S-Pharmacy Principals' identity from the PBMs as part of the NCPDP fraud described below) in exchange for $395,000 per week.

(qq)     The defendant agreed to similar prescription brokering terms with Conspirator #4, and, as a result, caused HealthRight to enter into similar agreements with A-Pharmacy, G-Pharmacy, and Z-Pharmacy, all of which were controlled by Conspirator #4. In addition, the defendant agreed with Conspirator #4 that the defendant would earn a per-unit commission for every unit of Durachol and other pain medications for which the defendant obtained a prescription and which was ultimately successfully billed.

(rr)     Neither the defendant, HealthRight, nor any other person or entity acting at the direction of the defendant, provided "marketing services" to any pharmacies. The only thing that the defendant and HealthRight provided to the S-Pharmacy Principals and Conspirator #4 were signed prescriptions (obtained by deceiving patients and doctors) for Inflated AWP Medications selected by the S-Pharmacy Principals and Conspirator #4 based solely upon their profitability.

(ss)     In return, the S-Pharmacy Principals paid the defendant and HealthRight not less than $31,935,751 (consisting of $27,292,675 paid on behalf of prescriptions purchased by S-Pharmacy and $4,643,076 paid on behalf of prescriptions purchased by PPM); and Conspirator #4 paid the defendant and HealthRight not less than $5,089,471 (consisting of $3,551,625 paid directly to HealthRight and $1,537,846 paid directly to the defendant).

Defendant's Initials _____

Page 17 of 31

(tt)    Other pharmacies involved in the conspiracy also paid the defendant and HealthRight millions of dollars for prescriptions for Inflated AWP Medications, including prescriptions covered by Medicare, TRICARE, Medicaid, or FECA.

### IV – Identity Concealment Fraud

(uu)    During the conspiracy, the defendant understood that various PBMs terminated their contracts with S-Pharmacy and A-Pharmacy.

(vv)    As a result of these terminations, the S-Pharmacy Principals created PPM in October 2016 for the purpose of billing HealthRight prescriptions that S-Pharmacy could not bill by re-directing those prescriptions through pharmacies in which the S-Pharmacy Principals had silent ownership or economic interests, including pharmacies in Florida, Indiana, and Texas. The defendant knew that the S-Pharmacy Principals concealed their economic interest in those pharmacies for the purpose of deceiving the PBMs.

(ww)    Similarly, on or about July 18, 2017, Conspirator #4 installed trusted confederates as the nominal owners of G-Pharmacy and Z-Pharmacy, but maintained control of the business and operations of both of those pharmacies. Conspirator #4 did this for the purpose of billing HealthRight prescriptions that A-Pharmacy could not bill by re-directing those prescriptions through G-Pharmacy and Z-Pharmacy. The defendant knew that Conspirator #4 had concealed his ownership of G-Pharmacy and Z-Pharmacy for the purpose of deceiving the PBMs.

(xx)    Moreover, Conspirator #4's involvement in the conspiracy included him concealing his control and ownership of A-Pharmacy by installing a confederate – B.H. – as the owner of that pharmacy. Prior to the time period of *this* conspiracy, the defendant sold prescriptions to a pharmacy called Oldsmar, which was owned and controlled by Conspirator #4.

Page 18 of 31

Defendant's Initials _____

In early 2015, the Federal Bureau of Investigation executed a search warrant of Oldsmar as part of a different criminal investigation, which then led to the decision by various PBMs to terminate Oldsmar. Thus, when the defendant agreed to sell prescriptions to Conspirator #4 (in *this* conspiracy), they both understood that Conspirator #4 had to conceal his ownership in the pharmacy – A-Pharmacy – that would bill the PBMs for those prescriptions. As such, the defendant knew that Conspirator #4 concealed his ownership of A-Pharmacy for the purpose of deceiving the PBMs.

5.      As to the scheme contemplated by Count Two: In support of the defendant's guilty plea, USDOJ-CPB and the defendant agree and stipulate to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and USDOJ-CPB retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

(a)      Between July 1, 2017 and August 1, 2018, the defendant was a member of the Board of Directors for HealthRight, a company in the business of marketing and selling numerous consumer products, including weight-loss pills, skin creams, and testosterone supplements (collectively, "consumer products"). The defendant personally operated, directed, and managed the consumer products marketing component of HealthRight. The defendant, working with others, drafted marketing materials; arranged for distribution of the materials; supervised others who managed a telemarketing call-center in Largo, Florida; directed the training of telemarketers on sales tactics and the use of sales scripts; and used various domestic and international corporate entities to process credit card transactions for HealthRight.

Defendant's Initials _____

Page 19 of 31

(b)     As part of HealthRight's telemarketing operations, the defendant and his co-conspirators knowingly and willfully devised call scripts that were designed to deceive consumers, in that they contained claims that were materially false, misleading, and omitted material information that induced consumers to allow credit card charges to HealthRight, for the financial benefit of HealthRight, the defendant, and his co-conspirators.

(c)     For example, HealthRight telemarketers made numerous false and deceptive claims to consumers about a variety of consumer products they sold. These claims included the following:

(i)     Telemarketers falsely claimed that a product called "Pure Garcinia Cambogia" would "prevent[] fat from being made" and "increase[] serotonin levels which helps you feel fuller longer, helps maintain healthy stress hormone cortisol that can decrease belly and thigh fat and most importantly it's all natural and stimulant free weight loss with no known side effects."

(ii)    Telemarketers falsely claimed that "Flawless Youth Skintensive Xcel," ("Flawless Youth") "uses a clinically proven formula that features acetyl hexapeptide 8, a material that mimics the effect on deep wrinkles of Botox."

(d)     The defendant and his co-conspirators trained HealthRight telemarketers to dissuade consumers from doing independent research on the products for fear they would discover these false claims in the call scripts. When consumers told telemarketers that they wanted to conduct further research, HealthRight's telemarketers would falsely tell consumers "I am the best resource for your research. I can give you more information and more specific responses to the questions you need answered than a website. Our product is 100% natural. I have all the ingredients here!"

Page 20 of 31

Defendant's Initials _____

(e)     HealthRight's sales scripts for many of its products lured consumers into purchasing products, falsely assuring them that their purchases were risk-free and promising excellent customer service.

(f)     Telemarketers took consumers' credit card information to cover what they described as minor "shipping costs" for the initial shipment, and then HealthRight enrolled them into a subscription for the product that would bill their credit cards for the consumer products on a monthly basis. Telemarketers deceptively assured consumers that the monthly enrollment was "risk free," and if for any reason they wanted to avoid that monthly charge, they simply needed to call HealthRight's customer service department, and upon speaking with those representatives, they could receive a full refund. Telemarketers also deceptively assured consumers that they could cancel the subscription at any time. These claims of excellent customer service, ease of returns, and subscription cancellations were false.

(g)     In fact, HealthRight's customer service was primarily an arm of the telemarketing force. Customers calling to cancel or demand refunds were not called back, put on hold, stalled, and, on the occasions that consumers did speak to someone at HealthRight, they otherwise were run through a gauntlet of scripted rebuttals that used many similar deceptive or unfounded claims that HealthRight used to market the products in the first place. For example, HealthRight "customer service" representatives would deceptively convince consumers demanding returns that "the product is said to work best over time, and was sold to you at a highly discounted rate. This is a one-time purchase, but you can always call back to reorder for the same low price. <Product Name> offers a full 30-day satisfaction guarantee to give you enough time to try the product and begin to see the results, OK?" Telemarketers also concealed HealthRight's corporate identity, identifying themselves as calling on behalf of the brand

Defendant's Initials _____

Page 21 of 31

themselves, for example, "Hi. This is _____ calling on behalf of Pure Garcinia Cambogia," never providing HealthRight's name specifically, While telemarketers did provide customer service numbers, HealthRight used over 20 service numbers for their products, causing confusion for consumers persistent enough to continue the refund process. Often, even after consumers returned the products and were promised refunds, they still incurred charges from HealthRight.

(h)     HealthRight telemarketers falsely promised consumers that the company would protect their personal and credit card information. In a scripted rebuttal to consumer concerns entitled "I don't give my card over the phone-credibility," HealthRight telemarketers would falsely state "I understand EXACTLY where you are coming from but the bank that approved you for that credit card would investigate the authenticity of this offer for you immediately!" Telemarketers convinced consumers that HealthRight "would NEVER jeopardize our privilege to charge credit cards as our normal way of doing business over a couple of dollars. You're in GREAT hands, so which card are you using today? Visa MasterCard or Discover?" In fact, HealthRight did not properly ensure the security of its servers or the information on it, which resulted in at least one security breach that exposed consumers' credit card information to outside parties.

(i)     The defendant and his co-conspirators were aware of consumer complaints about, and returns of, the products HealthRight sold, and were also aware that HealthRight experienced a high rate of credit card chargebacks. In spite of these consumer complaints, the defendant never took steps to investigate consumer complaints or alter HealthRight's business model.

(j)     Because HealthRight routinely sold products to thousands of consumers each month, chargebacks on those sales often exceeded numerical caps set by financial

Defendant's Initials _____          Page 22 of 31

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 4 *SEALED*   Filed 09/14/18   Page 22 of
31   PageID #: 57
Case 2:18-cr-00140-JRG-CRW   Document 34-1   Filed 07/02/20   Page 23 of 72   PageID #:
2971

institutions. In order to minimize the risk of chargebacks to HealthRight's consumer products telemarketing business, the defendant and his co-conspirators established a series of corporate entities, each of which was assigned a separate credit card merchant identification number ("MID") through which HealthRight passed payments and chargebacks. In cases where chargebacks exceeded or risked exceeding a relevant numerical cap, the defendant and his co-conspirators moved payment settlements from one MID to another. This diffused the risk that chargebacks in a given time period would reach or exceed a number that might result in financial institutions halting settlements, prolonging HealthRight's ability to work with financial institutions. This, in turn, allowed HealthRight's ability to charge consumer credit cards to continue.

6. The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

(a) the right to have his case presented to a grand jury for these crimes;

(b) the right to plead not guilty;

(c) the right to a speedy and public trial by jury;

(d) the right to assistance of counsel at trial;

(e) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

(f) the right to confront and cross-examine witnesses against the defendant;

(g) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

Defendant's Initials _____

Page 23 of 31

(h)    the right not to testify and to have that choice not used against the
defendant.

7.    The parties agree that the appropriate disposition of this case would be the
following as to each count:

(a)    The Court may impose any lawful term of imprisonment, any lawful fines,
and any lawful terms of supervised release up to the statutory maximums.

(b)    The Court will impose special assessment fees as required by law; and

(c)    The Court may order forfeiture as applicable and restitution as
contemplated by paragraph 10.

(d)    No promises have been made by any representative of USATNE or
USDOJ-CPB to the defendant as to what the sentence will be in this case. Any estimates or
predictions made to the defendant by defense counsel or any other person regarding any potential
sentence in this case are not binding on the Court, and may not be used as a basis to rescind this
agreement or withdraw the defendant's guilty plea. The defendant understands that the sentence
in this case will be determined by the Court after it receives the presentence investigation report
from the United States Probation Office and any information presented by the parties. The
defendant acknowledges that the sentencing determination will be based upon the entire scope of
the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors
and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. §
3553.

(e)    Pursuant to Rule 11(c)(1)(B), and in consideration of the terms of this plea
agreement and the policy statement set forth in U.S.S.G. § 6B1.2(b) and related commentary,
USATNE and USDOJ-CPB agree to recommend at the time of sentencing that: (i) pursuant to

Defendant's Initials _____                Page 24 of 31

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 4 *SEALED*   Filed 09/14/18   Page 24 of
31   PageID #: 59
Case 2:18-cr-00140-JRG-CRW   Document 2361   Filed 07/02/20   Page 25 of 72   PageID #:
2973

U.S.S.G. § 2B1.1(b)(1)(J), the total combined loss amount should be more than $3,500,000 but not more than $9,500,000, which is consistent with the specific restitution amount recommended, in light of the defendant's relative culpability, in paragraph 10; (ii) other than the specific offense characteristic set forth in the immediately-preceding clause, no further specific offense characteristics or enhancements should apply to the defendant's sentence; and (iii) the sentences on Counts One and Two be the same and be concurrent with one another. The defendant understands and agrees that the recommendations set forth in this paragraph are made pursuant to Rule 11(c)(1)(B) and, as such, are not binding on the Court. The defendant further understands and agrees that if the recommendations set forth in this paragraph are rejected by the Court, such rejection may not be used by the defendant as a basis to rescind this plea agreement or withdraw the defendant's guilty plea.

8.      Given the defendant's agreement to plead guilty, USATNE and USDOJ-CPB will not oppose a two-level reduction for acceptance of responsibility under the provisions of § 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to § 3E1.1(a), USATNE and USDOJ-CPB agree, at or before the time of sentencing, to move the Court to decrease the offense level by one additional level pursuant to § 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense, including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, USATNE and USDOJ-CPB will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines.

Defendant's Initials _____

Page 25 of 31

9.     The defendant agrees to pay the special assessment in this case prior to sentencing.

10.     The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for the losses caused to the victims of the offenses set forth in the Information relating to this agreement. Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties agree to recommend that the defendant be responsible, jointly and severally with HealthRight LLC, for restitution in an amount of $5,000,000, to be paid to the victims in this case, *i.e.*, the health care benefit programs. This amount reflects the defendant's role in the conspiracy and the defendant's lesser culpability relative to other responsible parties (as described in this plea agreement and underlying Information). In accordance with this stipulation, the parties agree, pursuant to 18 U.S.C. § 3664(h) to recommend to the Court that the defendant be held jointly and severally liable with HealthRight LLC for restitution of $5,000,000. The parties understand and agree that the total restitution[3] in this case will also be owed by others mentioned in this Plea Agreement and the Information, including HealthRight.

11.     In addition to restitution in this criminal case, the defendant may ultimately pay damages and penalties pursuant to a settlement in a parallel Federal civil proceeding with USATNE. The parties agree that any amounts paid by or on behalf of the defendant or HealthRight in the parallel Federal civil proceeding for the same loss (but not including amounts paid for penalties relating to any amounts paid for loss) to any of the same victims of the same offenses as the criminal case should offset the defendant's criminal restitution, in accordance

---

[3]  The total amount of restitution to be owed to the victims in this and the related cases is not fully known at the time of the signing of this plea agreement. In part, this is a result of the sheer number of health care benefit programs that suffered losses. The parties anticipate, however, that the full amount, and the apportionment of the full amount, of restitution will be known at the time of sentencing in this case and the related cases.

Page 26 of 31

Defendant's Initials _____

with 18 U.S.C. § 3664(j)(2). USATNE shall provide to the Clerk of the Court the amounts paid to any parallel victims for the same loss, so that the Clerk of the Court may reduce the balance of the defendant's restitution accordingly.

12.     The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

(a)     If so requested by USATNE or USDOJ-CPB, the defendant will promptly submit a completed financial statement to USATNE and USDOJ-CPB, in a form it or they provide and as it or they direct. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

Page 27 of 31

Defendant's Initials _____

Case 2:18-cr-00133-JRG-MCLC *SEALED*  Document 4 *SEALED*  Filed 09/14/18  Page 27 of
Case 2:18-cr-00140-JRG-CRW  Document 230  Filed 07/02/20  Page 28 of 72  PageID #:
2976

(b)     The defendant expressly authorizes USATNE and USDOJ-CPB to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

(c)     If so requested by USATNE or USDOJ-CPB, the defendant will promptly execute authorizations on forms provided by USATNE and USDOJ-CPB to permit USATNE and USDOJ-CPB to obtain financial and tax records of the defendant.

13.     The defendant acknowledges that the principal benefits to USATNE and USDOJ-CPB of this agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by USATNE and USDOJ-CPB in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense committed, the defendant voluntarily, knowingly, and intentionally agrees to the following:

(a)     The defendant will not file a direct appeal of the defendant's conviction or sentence with one exception:  The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater.  The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

(b)     The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

Defendant's Initials _____

Page 28 of 31

(c)     The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

14.     This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. The defendant's signature on this plea agreement constitutes the defendant's admission that the facts contained herein are true and accurate. If USATNE or USDOJ-CPB violate the terms of this agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this agreement in any way (including, without limitation, by failing to enter a guilty plea as agreed herein, moving to withdraw guilty plea after entry, or by violating any court order or any local, state, or federal law pending the resolution of this case), then USATNE or USDOJ-CPB will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, USATNE or USDOJ-CPB may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges that USATNE and USDOJ-CPB agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to prosecution for the conduct contemplated by this agreement. The defendant also understands and agrees that a violation of this agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea in this case.

15.     The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even

Defendant's Initials _____

Page 29 of 31

though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

16. ' This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charges, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

\* \* \* \* \*

Defendant's Initials _____

Page 30 of 31

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 4 *SEALED*   Filed 09/14/18   Page 30 of
Case 2:18-cr-00140-JRG-CRW   Document 231   Filed 07/02/20   Page 31 of 72   PageID #:
2979

J. Douglas Overbey
United States Attorney

As to Count One for USATNE:

_9/14/2018_
Date

By: _[signature]_
Timothy C. Harker
Assistant United States Attorney

_9/14/2018_
Date

By: _[signature]_
David L. Gunn
Assistant United States Attorney

_9/14/2018_
Date

By: _[signature]_
Anne-Marie Svolto
Assistant United States Attorney

_9/14/2018_
Date

As to Count Two for USDOJ-CPB:

_[signature]_
John Claud
USDOJ Trial Attorney

As to Counts One and Two for the Defendant:

_9/12/18_
Date

_[signature]_
Scott G. Roix
Defendant

_9/12/18_
Date

_[signature]_ by _[signature]_ with permission
Roger Dickson
Attorney for the Defendant

_9/12/18_
Date

_[signature]_
Zac Greene
Attorney for the Defendant

_9/12/18_
Date

_[signature]_ by _[signature]_ with permission
Christopher Kise
Attorney for the Defendant

Signature Page to Scott Gregory Roix Plea Agreement

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 4 *SEALED*   Filed 09/14/18   Page 31 of
Case 2:18-cr-00140-JRG-CRW   Document 4 Filed 07/02/20   Page 32 of 72   PageID #:
2980



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 2:18-CR-133 |
| | ) | |
| v. | ) | Judge: Greer / Corker |
| | ) | |
| SCOTT GREGORY ROIX | ) | **FILED UNDER SEAL** |

## PLEA AGREEMENT SUPPLEMENT

The parties agree that the following additional terms are part of the Plea Agreement in the above-captioned case:

1.      The defendant further agrees to cooperate fully, completely, and truthfully with any and all law enforcement agents and personnel of the United States Attorney's Office. This cooperation includes, but is not limited to, meeting with and being interviewed by such law enforcement agents or personnel of the United States Attorney's Office whenever requested. The defendant further agrees not to protect anyone who was truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses. The defendant further agrees to testify completely and truthfully before a grand jury, at any trial, or at any other proceeding if called upon by the United States to do so. Upon request by the United States, the defendant must furnish all documents, objects and other evidence in the defendant's possession, custody, or control that are relevant to the United States' inquiries. The defendant and defense counsel also knowingly, voluntarily, and intentionally waive the defendant's right (where applicable) to have defense counsel present during the course of cooperation, including questioning or court appearances.

2.  To ensure the defendant's truthful cooperation, the United States agrees, except as provided below, not to use any self-incriminating information provided by the defendant pursuant to this written plea agreement against the defendant. However, nothing in this plea agreement shall restrict the use of any information (1) known to the United States prior to entering into this written plea agreement, (2) obtained from any other source, or (3) concerning the defendant's prior criminal record. Should any of the following occur (1) the defendant provides false or misleading information during the course of the defendant's cooperation, (2) the defendant moves to withdraw the defendant's guilty plea, or (3) the defendant breaches any other of the terms of this plea agreement, then the United States may make use of any information provided by the defendant to law enforcement authorities at any time (including any information provided during formal or informal proffer sessions prior to signing this plea agreement, and any information provided after signing this plea agreement) for any purpose in any subsequent proceeding, including grand jury, trial, and sentencing phases of this case or in any other prosecutions or proceedings against the defendant or others. Moreover, if the United States determines at any time (before or after sentencing) that the defendant has failed to cooperate fully, completely, and truthfully, or otherwise violated any of the terms of this plea agreement, it will be free to withdraw any favorable sentencing motion filed by the United States, including motions filed under U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553.

3.  At the time of sentencing, the United States may bring to the Court's attention the nature, extent, and value of the defendant's cooperation so that it may be considered in determining a fair and appropriate sentence under the facts of the case.

2

J. Douglas Overbey
United States Attorney

**As to Count One for USATNE:**

_9/14/2018_
Date

By: _[signature]_
Timothy C. Harker
Assistant United States Attorney

By: _[signature]_

_9/14/2018_
Date

David L. Gunn
Assistant United States Attorney

_9-14-2018_
Date

By: _[signature]_
Anne-Marie Svolto
Assistant United States Attorney

**As to Count Two for USDOJ-CPB:**

_9/14/2018_
Date

_[signature]_ for John Claud
John Claud
USDOJ Trial Attorney

**As to Counts One and Two for the Defendant:**

_9/12/18_
Date

_[signature]_
Scott G. Roix
Defendant

_9/12/18._
Date

_[signature]_ Roger W. Dickson by [signature] with permission
Roger Dickson
Attorney for the Defendant

_9/12/18_
Date

_[signature]_
Zac Greene
Attorney for the Defendant

_9/12/18_
Date

_[signature]_ Christopher Kise by [signature] with permission
Chris Kise
Attorney for the Defendant

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 2:18-CR-133 |
| | ) | |
| v. | ) | Judge: GREER |
| | ) | |
| HEALTHRIGHT LLC | ) | **FILED UNDER SEAL** |

PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of

Tennessee ("USATNE"), the United States Department of Justice, Consumer Protection Branch

("USDOJ-CPB"), the defendant, HEALTHRIGHT LLC, and the defendant's attorneys, Michael

Diamondstein, Esq. and Hugh Ward, Esq., have agreed upon the following:

1.     The defendant will waive indictment and arraignment and plead guilty to an

information charging the defendant with the following offenses:

(a)     Count One – Conspiracy to Commit Health Care Fraud: the defendant

knowingly, intentionally, and unlawfully conspired with one or more other persons to commit

Health Care Fraud in violation of 18 U.S.C. § 1347, and one or more such persons did an act to

effect the object of the conspiracy, all in violation of 18 U.S.C. § 371.  The maximum

punishment for this offense is a fine not to exceed $500,000 or twice the gross gain or gross loss

resulting from the offense, whichever is greatest (*see* 18 U.S.C. § 3571(c), (d)), and a $400

special assessment (*see* 18 U.S.C. § 3013(a)(2)(B)).

(b)     Count Two – Conspiracy to Commit Wire Fraud: the defendant

knowingly, intentionally, and unlawfully conspired with one or more other persons to commit

Wire Fraud in violation of 18 U.S.C. § 1343, and one or more such persons did any act to effect

the object of the conspiracy, all in violation of 18 U.S.C. § 371.  The maximum punishment for

Page 1 of 33

this offense is a fine not to exceed $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest (*see* 18 U.S.C. § 3571(c), (d)), and a $400 special assessment (*see* 18 U.S.C. § 3013(a)(2)(B)).

    2.      In consideration of the defendant's guilty pleas:

        (a)      USATNE agrees not to further prosecute the defendant in the Eastern District of Tennessee for any other non-tax criminal offenses committed by the defendant that are related to the charges contained in the information in this case and that are known to USATNE at the time this plea agreement is signed by both parties.

        (b)      USDOJ-CPB agrees not to further prosecute the defendant in any district in the United States for any other non-tax criminal offenses committed by the defendant that are related to the charges contained in the information in this case and that are known to USDOJ-CPB at the time this plea agreement is signed by both parties.

    3.      The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crimes charged.

    4.      As to the scheme contemplated by Count One: In support of the defendant's guilty plea, USATNE and the defendant agree and stipulate to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and USATNE retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

        (a)      From on or about June 1, 2015 through on or about April 1, 2018, the defendant conspired with the persons and entities described below (and other persons and entities, including other pharmacies) to implement a scheme and artifice to defraud patients,

doctors, health care benefit programs, and pharmacy benefit managers out of not less than $100,000,000 and, in furtherance thereof, caused to be submitted not less than approximately $505,000,000 in fraudulent claims for payment, as further described herein.

<u>Persons and Related Entities</u>

(b)    The subjects include the following persons and entities:

(i)    The defendant and Scott Gregory Roix ("<u>Scott Roix</u>").  At all times relevant to the conspiracy, the defendant was owned and controlled by Scott Roix and his business partner H.S.

(ii)    SPS Inc., SPS LLC, and SP LLC (these three entities, "<u>S-Pharmacy</u>"), PPM LLC ("<u>PPM</u>"),[1] and the three owners thereof (the "<u>S-Pharmacy Principals</u>").  At all times relevant to the conspiracy, the S-Pharmacy Principals owned and controlled S-Pharmacy and PPM;

(iii)    AOP LLC ("<u>A-Pharmacy</u>"), GP Inc. ("<u>G-Pharmacy</u>"), ZP ("<u>Z-Pharmacy</u>"),[2] and a person known as "Conspirator #4."  At all times relevant to the conspiracy, Conspirator #4 controlled A-Pharmacy, G-Pharmacy, and Z-Pharmacy.  Conspirator #4 also received all or substantially all of the revenue obtained by those pharmacies as part of the conspiracy; and

(iv)    Numerous other persons and entities (including pharmacies) that the defendant has identified or will identify for USATNE.

<u>Background</u>

(c)    During the conspiracy, the defendant was an e-medicine company that provided patients with a means of communicating directly with doctors about medical issues.

---

[1] These are not the real names of these corporate entities.
[2] These are not the real names of these corporate entities.

Case 2:18-cr-00133-JRG-MCLC *SEALED*  Document 8 *SEALED*  Filed 09/24/18  Page 3 of 33  PageID #: 74
Case 2:18-cr-00140-JRG-CRW  Document 223-1  Filed 07/02/20  Page 38 of 72  PageID #: 2986

The defendant had a legitimate business model and an illegitimate business model. As part of the legitimate business model, the defendant contracted with companies called *locum tenens* (essentially doctor staffing agencies), which in turn contracted with doctors. The doctors that participated in the defendant's electronic medicine platform (the "care platform") were able to interact with patients via telephone or video conference and write prescriptions for non-controlled substances for patient ailments. The defendant paid the doctors approximately $25 for each patient "tele-consult" they conducted. In turn, the defendant charged each patient $55 for the doctor consult, netting $30 in the process. In the event that the doctor authorized a prescription, the defendant had no interest in which pharmacy the patients selected to fill their prescriptions.

## Summary of the Conspiracy

(d)     The defendant also had an unlawful and illegitimate business model. The defendant employed this illegitimate business model in furtherance of the conspiracy. The illegitimate business model altered the process described in paragraph 4(c) above in important ways. In the legitimate business model, patients who wanted medical care sought out the defendant to connect them to doctors for the purpose of obtaining prescriptions for common ailments (like antibiotics). In the illegitimate model, the defendant deceived patients to create enormous artificial demand for prescription medications that patients were led to believe would provide treatment for their ailment. In the legitimate model, the defendant charged patients $55 for a telemedicine consult. In the illegitimate model, the defendant automatically qualified patients for a no-consult and charged patients nothing (because the patients would not pay for medications they did not want) and then sold signed prescriptions to the conspiring pharmacies for approximately $500 each. In the legitimate model, the defendant did not care whether the

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 8 *SEALED*   Filed 09/24/18   Page 4 of 33   PageID #: 75
Case 2:18-cr-00140-JRG-CRW   Document 228   Filed 07/02/20   Page 39 of 72   PageID #: 2987

patients had health insurance. In the illegitimate model, the patients were automatically disqualified if they did not have health insurance. In the legitimate model, the defendant was indifferent to whether doctors prescribed medications, which medications were prescribed, or which pharmacy filled the prescriptions. In the illegitimate model, the defendant took steps to ensure that doctors issued prescriptions, that those prescriptions were for medications pre-selected by the conspiring pharmacies (based solely upon profitability), and that the prescriptions for those medications were delivered immediately by electronic means to the conspiring pharmacies, not allowing patients to choose their own pharmacy. Scott Roix and the defendant designed and implemented the illegitimate business model described in this paragraph for the purpose of furthering the conspiracy.

(e)     Scott Roix and the defendant knew that the illegitimate business model required that the defendant engage in a variety of deceptive practices. First, Scott Roix and the defendant employed a number of fraudulent techniques to deceive patients to disclose their insurance information to the defendant. Second, Scott Roix and the defendant employed a number of fraudulent techniques to deceive doctors into issuing prescriptions for pre-selected medications. Third, Scott Roix and the defendant sold those prescriptions to the conspiring pharmacies in violation of federal law (in the case of patients with Medicare, TRICARE, coverage pursuant to the Federal Employees' Contribution Act ("FECA"), or Medicaid) and in violation of Fla. Stat. § 465.185 law (in the case of patients with any insurance, including private insurance).

(f)     The first part of the scheme was designed and implemented by Scott Roix and the defendant, but that was only one half of the scheme. The second part of the scheme was designed and implemented by the S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-

Case 2:18-cr-00133-JRG-MCLC *SEALED*  Document 8 *SEALED*    Filed 09/24/18  Page 5 of
33   PageID #: 76
Case 2:18-cr-00140-JRG-CRW   Document 223-1  Filed 07/02/20   Page 40 of 72   PageID #:
2988

Pharmacy, G-Pharmacy, Z-Pharmacy and other persons and pharmacies. They depended upon one another, and Scott Roix and the defendant conspired with all of them.

(g)     Scott Roix and the defendant understood that the conspiring pharmacies and their principals could not submit claims for payment for high-reimbursing prescription medications without first obtaining signed prescriptions for insured patients. As described herein, Scott Roix and the defendant developed the illegitimate business model to use the defendant's care platform to obtain those prescriptions for insured patients. Scott Roix and the defendant also understood that they couldn't make any money for the prescriptions unless they sold them to the pharmacies. In effect, because the defendant was providing the e-consult to the patient at no cost, selling the resulting prescription was the only way for Scott Roix and the defendant to make money as part of this scheme.

(h)     Thus, beginning on or about June 2015 and continuing through on or about April 1, 2018, Scott Roix and the defendant conspired with the S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-Pharmacy, G-Pharmacy, and Z-Pharmacy, and other persons and pharmacies, to: (i) use the defendant's care platform to obtain prescriptions that were pre-selected by the pharmacies based upon profitability using a variety of fraudulent techniques; (ii) sell those prescriptions to the S-Pharmacy Principals and Conspirator #4, among others; (iii) submit bills to the health care benefit programs for those prescriptions; and (iv) cause the pharmacies to employ several additional fraudulent techniques (known to Scott Roix and the defendant) to ensure that the health care benefit programs continued to pay for those fraudulently-obtained prescriptions throughout the conspiracy.

(i)     The S-Pharmacy Principals and Conspirator #4 selected medications because the S-Pharmacy Principals and Conspirator #4 were able to obtain extraordinarily high

reimbursement rates for them by exploiting the difference between their actual acquisition cost and the publicly-reported average wholesale price (each such medication, an "Inflated AWP Medication"). The S-Pharmacy Principals and Conspirator #4 were frequently able to obtain compensation for Inflated AWP medications that was between three and ten times their actual costs.

 (j) During the conspiracy, the defendant understood that the pharmacies obtained this compensation by submitting bills to companies called pharmacy benefit managers ("PBM") that adjudicated prescription claims on behalf of Medicare, TRICARE, Medicaid, FECA, the Federal Employees Health Benefit Program ("FEHBP"), and private insurance companies. There were many such PBMs, and some of the largest in the country included Express Scripts, CVS Caremark, Optum, and Prime Therapeutics.

 (k) From approximately September 1, 2015 through approximately April 1, 2018, S-Pharmacy and PPM submitted not less than approximately $320,000,000 in fraudulent claims and actually received from the PBMs not less than approximately $81,000,000 from the PBMs for fraudulently-obtained prescriptions for Inflated AWP Medications purchased from Scott Roix and the defendant.

 (l) From approximately November 2016 through approximately December 2017, A-Pharmacy, G-Pharmacy, and Z-Pharmacy submitted not less than approximately $185,649,000 in fraudulent claims and actually received from the PBMs not less than approximately $24,495,000 for fraudulently-obtained prescriptions for Inflated AWP Medications purchased from Scott Roix and the defendant.

 (m) S-Pharmacy received approximately $1,027,975 from Medicare, $426,929 from TRICARE, $1,021,161 from various state Medicaid programs (including the Medicaid

Case 2:18-cr-00133-JRG-MCLC *SEALED* Document 8 *SEALED* Filed 09/24/18 Page 7 of 33 PageID #: 78
Case 2:18-cr-00140-JRG-CRW Document 223-1 Filed 07/02/20 Page 42 of 72 PageID #: 2990

programs for the states of Alaska, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Michigan, Minnesota, Nevada, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Washington, and West Virginia), $828,297 from FEHBP, and approximately $108,582 from FECA.

(n)     The S-Pharmacy Principals, S-Pharmacy, PPM, Conspirator #4, A-Pharmacy, G-Pharmacy, and Z-Pharmacy then paid approximately $37,025,000 to Scott Roix and the defendant for those prescriptions in direct violation of federal or state law. Other persons and pharmacies also paid the defendant to buy fraudulent prescriptions.

### I - Patient Deception

(o)     During the conspiracy, Scott Roix caused the defendant to generate in excess of 100,000 prescriptions for Inflated AWP Medications that it sold to the S-Pharmacy Principals and Conspirator #4 among other persons and entities, as described below in the section entitled "Prescription Brokering." Each of these signed prescriptions corresponded to a patient with Medicare, Tricare, Medicaid, FECA, FEHBP, or private insurance.

(p)     To generate the enormous number of insurance-covered prescriptions for Inflated AWP Medications, Scott Roix and the defendant employed a variety of techniques to deceive patients and induce them into providing their insurance information. In particular, Scott Roix and the defendant: (i) placed deceptive and misleading advertisements on various websites and social media outlets including, without limitation, Facebook and Yahoo!, indicating that the defendant offered cannabis-based medication and clinical research trials utilizing cannabidiol oil ("CBD oil") or stem cells; (ii) misinformed patients that the Inflated AWP Medications were effective at treating various ailments; (iii) deceived patients into believing that they were speaking with nurses or other practitioners who were engaged in the practice of medicine;

(iv) intentionally withheld from patients the exorbitant amounts that would be billed to the patients' insurance for the Inflated AWP Medications; (v) intentionally withheld from patients that the pharmacies were paying the defendant for prescriptions for Inflated AWP Medications; (vi) deceived patients into believing that the prescribed Inflated AWP Medications were custom tailored to their individual needs; (vii) employed intentionally vague and misleading call scripts to induce patients to say "yes" to certain recorded questions to make it appear, falsely, that the patients understood and agreed to receive Inflated AWP Medications; (viii) substituted Inflated AWP Medications without obtaining patient approval or notifying patients of the substitution; and (ix) transferred patient prescriptions for Inflated AWP Medications from one pharmacy to another without notifying patients, among other techniques.

(q)     Scott Roix and the defendant knew that many or all of the above techniques were necessary to obtain insurance information from patients. For example, the defendant caused false and misleading advertisements to be placed on various internet sites, including on Facebook and Yahoo!. An example of four of those false and misleading ads is below:

 

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 8 *SEALED*   Filed 09/24/18   Page 9 of 33   PageID #: 80

 

(r) Scott Roix knew that the defendant never offered any cannabis-based medication, never offered any clinical trials relating to cannabis or CBD oil, and never offered any trials or medications related to stem-cell therapy. Scott Roix knew that the above advertisements were plainly fraudulent. Scott Roix caused the defendant's call center staff to mislead, deceive, and "string" patients along so that the patients believed they would receive CBD-oil, or be enrolled at some point in a cannabis-based or stem-cell based clinical trial. Scott Roix knew that the whole purpose of the deceptive ads and deceptive calls was to obtain patient insurance information. Scott Roix also knew that many patients would not have provided insurance information to the defendant if they understood they would never receive CBD oil or cannabis-based medications or clinical research trials.

(s) Scott Roix knew that hundreds or thousands of patients were deceived by the above ads and the subsequent phone calls with the call center staff. As a result of such deception, these patients provided their insurance information to the defendant, which Scott Roix and the defendant used to obtain prescriptions to sell to the pharmacies.

(t) Scott Roix also ensured that the defendant's call center staff were incentivized to, and did in fact, engage in dishonest and deceptive techniques to obtain insurance information from patients. Scott Roix incentivized the call center staff through a compensation

Page 10 of 33

structure that paid call center employees a bonus each time they were able to obtain insurance information from patients.

(u) After talking to an initial call center employee (the "phase I" call), patients were transferred to a second call center employee for the purpose of providing answers to a series of pre-printed questions regarding the patients' medical history (the "phase II" call).

(v) The defendant caused the phase II employee to identify himself or herself to the patient as a "clinical staff member," "medical assistant," "nurse" or other title that suggested to the patients that the phase II employee was a trained, licensed, and practicing medical professional. In fact, as the defendant knew, none of the phase II employees was actually practicing medicine while employed at the defendant. During the conspiracy, Scott Roix and the defendant explicitly prevented their "medical staff" from practicing medicine and made it clear to the S-Pharmacy Principals and Conspirator #4 that they were *not* engaged in the practice of medicine. Scott Roix and the defendant never informed patients of this fact and instead allowed the patients to believe the opposite based upon the defendant's actions. Scott Roix understood and intended that this technique caused patients to believe that they were talking to an employee who was trained and licensed to practice medicine and *actually was* practicing medicine when in fact no employee of the defendant practiced medicine while employed by the defendant.

(w) The defendant admits that tens of thousands of patients were deceived by the defendant using the techniques described in this section, and that as a result of such deception these patients provided the defendant with their insurance information. The vast majority of the patients would not have provided their insurance information to the defendant had the defendant utilized honest advertising practices and honest call scripts.

(x)     The defendant also ensured that the overwhelming majority (in excess of

95%) of all patients who received prescriptions for Inflated AWP Medications *never* spoke with

the prescribing doctor and never consulted or interacted in any meaningful way with any person

lawfully engaged in the practice of medicine.

(y)     Of the tens of thousands of patients deceived by the techniques authorized

by the defendant and implemented by the defendant, hundreds were located in the Eastern

District of Tennessee, including the following list of patients in the Eastern District of

Tennessee:

| Patient | Pharmacy | Approx. Date of Rx | Prescribed Inflated AWP Medications | Amount Billed | Amount Paid |
|---------|----------|--------------------|-------------------------------------|---------------|-------------|
| S.C. | S-Pharmacy | 3/2016 | Lidocaine 5%; Diclofenac 3%; Doxepin 5% | $32,354 | $22,520 |
| L.S. | S-Pharmacy | 6/2016 | Lidocaine 5%; Diclofenac 3% | $49,745 | $32,362 |
| J.F. | S-Pharmacy | 7/2016 | Lidocaine 5%; Diclofenac 3% | $24,876 | $16,890 |
| D.W. | S-Pharmacy | 3/2017 | Lidocaine 5%; Dihydroergotamine | $18,920 | $15,229 |
| J.S. | S-Pharmacy | 3/2017 | Dihydroergotamine; Lidocaine 5%; Diclofenac 3% | $19,704 | $13,419 |
| J.B. | S-Pharmacy | 4/2017 | Lidocaine 5%; Doxepin 5%; Dihydroergotamine; | $21,018 | $17,450 |
| P.O. | A-Pharmacy | 9/2017 | Diclofenac 3%; Fenortho Cap | $18,080 | $5,440 |
| R.W. | A-Pharmacy | 9/2017 | Diclofenac 3%; Lidocaine 5%; Fenortho Cap | $12,291 | $4,707 |
| B.N. | A-Pharmacy | 9/2017 | Diclofenac 3%; Cifrazol Cap | $18,376 | $3,555 |
| T.W. | A-Pharmacy | 10/2017 | Diclofenac 3%; Lidocaine 5%; Fenortho Cap | $23,935 | $9,434 |

(z)     Scott Roix also caused the defendant to discount its standard patient

consultation fee of approximately $55 to $0 for every patient contacted by the defendant about

Inflated AWP Medications because the defendant knew that the patients did not understand that

their information would be used to generate prescriptions that were sold to conspiring

pharmacies. Through this process, the defendant created the appearance of demand for Inflated

AWP Medications, but no such demand actually existed.

(aa)     Deceiving patients was only the first step in the conspiracy. Scott Roix

and the defendant also needed to obtain prescriptions from doctors for Inflated AWP

Medications for each patient who had provided his or her insurance information to the defendant.

Without those signed prescriptions, the defendant would not be able to meet his end of the

Page 12 of 33

prescription brokering bargain with the S-Pharmacy Principals and Conspirator #4, as described below in the section entitled "Prescription Brokering."

## II - Doctor Deception

(bb)     After obtaining patient authorization using the misleading methods described above, the defendant deceived doctors to authorize medically unnecessary prescriptions for Inflated AWP Medications. To accomplish this, Scott Roix and the defendant: (i) misrepresented to doctors that patients had requested specific Inflated AWP Medications by name; (ii) intentionally concealed from doctors that the pharmacies paid the defendant on a per-prescription basis or split revenue with the defendant in violation of federal or state law; (iii) intentionally concealed from participating doctors the fact that many patients had stated that the Inflated AWP Medications were ineffective at treating patient ailments; (iv) re-submitted prescriptions for Inflated AWP Medications to different doctors if the first doctor did not authorize a prescription or wrote a prescription for a non-Inflated AWP Medication; (v) designed the care platform in a manner that channeled participating doctors to select an Inflated AWP Medication from a drop-down menu that was pre-populated with a list consisting only of Inflated AWP Medications, all of which were selected by the S-Pharmacy Principals and Conspirator #4 (and others whose identities are known to the defendant); and (vi) misled doctors to believe that many patients had requested 3 automatic refills, among other techniques.

(cc)     Scott Roix also instructed the defendant's staff to explain to doctors the importance of: (i) writing prescriptions for the Inflated AWP Medications; (ii) authorizing substitutions; and (iii) prescribing the "supplemental therapies" (which also were Inflated AWP Medications selected by the pharmacies).

Page 13 of 33

(dd)     Scott Roix also caused the defendant's staff to indicate to doctors that patients had requested or were interested in "supplemental medications" like scar creams, migraine medications, or "Durachol" (essentially a multi-vitamin), all of which were Inflated AWP Medications. In response, those doctors wrote thousands of prescriptions for those supplemental therapies that the defendant then sold to the pharmacies. In turn, the pharmacies billed those prescriptions to the PBMs. In fact, as the defendant knew, on most occasions, those patients had not requested those supplemental therapies and did not understand that their insurance companies would be billed for them.

(ee)     Dr. J.L., was a physician whose practice was located in the Eastern District of Tennessee.

(ff)     From approximately June 1, 2015 through his decision to cease issuing prescriptions through the defendant's care platform in the summer of 2016, Dr. J.L. authorized thousands of prescriptions for Inflated AWP Medications that the defendant then sold to pharmacies participating in the conspiracy. Those prescriptions resulted in not less than 605 claims paid by the PBMs corresponding to at least 231 patients, many of whom were located in the Eastern District of Tennessee.

(gg)     Once the defendant had obtained patient insurance information and corresponding prescriptions for Inflated AWP Medications from the defendant's participating doctors (including prescriptions written by Dr. J.L.), the defendant then sold those prescriptions to the S-Pharmacy Principals, Conspirator #4, and others so that they could bill them to the PBMs.

(hh)     The defendant understood that selling those prescriptions was in violation of federal law and in violation of Fla. Stat. 465.185 (in the case of patients with any insurance,

Page 14 of 33

including private insurance). The defendant also understood that the PBMs required the pharmacies to obtain prescriptions and bill for them in accordance with applicable federal and state laws. The PBMs would not have reimbursed the pharmacies for prescriptions for Inflated AWP Medications if they had known that the pharmacies had purchased them from the defendant in violation of federal or state law.

### III - Prescription Brokering

(ii)     The defendant entered into written agreements for the purpose of selling prescriptions to the pharmacies. Those written "marketing agreements" were designed to conceal the actual prescription brokering arrangements between the parties.

(jj)     The defendant entered into written "marketing agreements" with S-Pharmacy, PPM, A-Pharmacy, and others involved in the conspiracy. These marketing agreements provided that the defendant would perform marketing and brand development services on behalf of S-Pharmacy, PPM, and A-Pharmacy in return for a flat fee calculated on a monthly basis determined in advance of each month.

(kk)     Beginning on or around September 2015 and continuing through approximately May 2016, the written marketing agreement between the defendant and S-Pharmacy required S-Pharmacy to pay the defendant a monthly fee calculated as $37,650 multiplied by the number of full time employees that the defendant would dedicate to the S-Pharmacy account in the upcoming month. The agreement also stated: "The parties further agree that the Fee is not based on the value or volume of services generated by the defendant on behalf of [S-Pharmacy]." The purpose of this agreement was to make it appear that the defendant had a legitimate business relationship with S-Pharmacy pursuant to which it would provide *bona fide* marketing services, but not be selling prescriptions.

(ll)     In reality, the monthly fee that S-Pharmacy paid to the defendant during the conspiracy was calculated *only as a function* of the "value [and] volume" of prescriptions for Inflated AWP Medications that the defendant sent to S-Pharmacy. In fact, the defendant agreed with the S-Pharmacy Principals that they would split the net revenue from successfully billed prescriptions equally; and the defendant caused the defendant staff to exchange dozens or hundreds of emails with S-Pharmacy to track the delivery of and billing for prescriptions sent from the defendant to S-Pharmacy. Scott Roix, with the assistance of the defendant's staff, also conspired with the S-Pharmacy Principals to create invoices and other documents that made it appear as though the monthly fee was calculated in the manner contemplated by the written marketing agreement when, in fact, the defendant knew that they were sharing revenue with S-Pharmacy.

(mm)   Beginning around May 2016, the fee provision in the written marketing agreement between S-Pharmacy and the defendant was changed. From that point forward, S-Pharmacy agreed to pay a flat fee to the defendant in the amount of $300,000 per week for marketing services.

(nn)    Around the fall of 2016, the defendant entered into a another flat-fee written marketing agreement with PPM, which was controlled entirely by the S-Pharmacy Principals, as further described in the section entitled "Identity Concealment Fraud" below. From that point forward, PPM agreed to pay a flat fee to the defendant in the amount of $95,000 per week for marketing services.

(oo)    The defendant's flat fee agreements with S-Pharmacy and PPM both contained language stating that the fee was not based upon the "value or volume of services generated by the defendant on behalf of" S-Pharmacy or PPM. However, beginning in May

Page 16 of 33

Case 2:18-cr-00133-JRG-MCLC *SEALED*  Document 8 *SEALED*  Filed 09/24/18  Page 16 of 33  PageID #: 87
Case 2:18-cr-00140-JRG-CRW  Document 223-1  Filed 07/02/20  Page 51 of 72  PageID #: 2999

2016, the defendant had agreed to sell signed prescriptions to S-Pharmacy at a rate of

approximately $500 per prescription. PPM joined the agreement on the same terms in October

2016.

        (pp)    Specifically, in May 2016, the defendant actually agreed with the S-

Pharmacy Principals that the defendant would deliver approximately 2,600 signed prescriptions

per month to S-Pharmacy in exchange for $300,000 per week.

        (qq)    On October 10, 2016, Scott Roix on behalf of the defendant exchanged

emails with an S-Pharmacy Principal in which Scott Roix on behalf of the defendant agreed to

deliver approximately 3,400 signed prescriptions per month to S-Pharmacy and PPM (the entity

created for purposes of concealing the S-Pharmacy Principals' identity from the PBMs as part of

the NCPDP fraud described below) in exchange for $395,000 per week.

        (rr)    The defendant and Scott Roix agreed to similar prescription brokering

terms with Conspirator #4, and, as a result, caused the defendant to enter into similar agreements

with A-Pharmacy, G-Pharmacy, and Z-Pharmacy, all of which were controlled by Conspirator

#4.

        (ss)    Neither Scott Roix, the defendant, nor any other person or entity acting at

the direction of Scott Roix or the defendant, provided "marketing services" to any pharmacies.

The only thing that Scott Roix and the defendant provided to the S-Pharmacy Principals and

Conspirator #4 were signed prescriptions (obtained by deceiving patients and doctors) for

Inflated AWP Medications selected by the S-Pharmacy Principals and Conspirator #4 based

solely upon their profitability.

        (tt)    In return, the S-Pharmacy Principals paid Scott Roix and the defendant not

less than $31,935,751 (consisting of $27,292,675 paid on behalf of prescriptions purchased by S-

Case 2:18-cr-00133-JRG-MCLC *SEALED* Document 8 *SEALED* Filed 09/24/18 Page 17 of 33 PageID #: 88

Pharmacy and $4,643,076 paid on behalf of prescriptions purchased by PPM); and Conspirator #4 paid Scott Roix and the defendant not less than $5,089,471 (consisting of $3,551,625 paid directly to the defendant and $1,537,846 paid directly to the defendant).

(uu)    Other pharmacies involved in the conspiracy also paid Scott Roix and the defendant millions of dollars for prescriptions for Inflated AWP Medications, including prescriptions covered by Medicare, TRICARE, Medicaid, or FECA.

### IV – Identity Concealment Fraud

(vv)    During the conspiracy, the defendant understood that various PBMs terminated their contracts with S-Pharmacy and A-Pharmacy at various times during the conspiracy.

(ww)    As a result of these terminations, the S-Pharmacy Principals created PPM in October 2016 for the purpose of billing the defendant prescriptions that S-Pharmacy could not bill by re-directing those prescriptions through pharmacies in which the S-Pharmacy Principals had silent ownership or economic interests, including pharmacies in Florida, Indiana, and Texas. Scott and the defendant Roix knew that the S-Pharmacy Principals concealed their economic interest in those pharmacies for the purpose of deceiving the PBMs.

(xx)    Similarly, on or about July 18, 2017, Conspirator #4 installed trusted confederates as the nominal owners of G-Pharmacy and Z-Pharmacy, but maintained control of the business and operations of both of those pharmacies. Conspirator #4 did this for the purpose of billing the defendant prescriptions that A-Pharmacy could not bill by re-directing those prescriptions through G-Pharmacy and Z-Pharmacy. Scott Roix and the defendant knew that Conspirator #4 had concealed his ownership of G-Pharmacy and Z-Pharmacy for the purpose of deceiving the PBMs.

(yy)     Moreover, Conspirator #4's involvement in the conspiracy included him concealing his control and ownership of A-Pharmacy by installing a confederate – B.H. – as the owner of that pharmacy. Prior to the time period of *this* conspiracy, a predecessor entity to the defendant sold prescriptions to a pharmacy called Oldsmar, which was owned and controlled by Conspirator #4. In early 2015, the Federal Bureau of Investigation executed a search warrant of Oldsmar as part of a different criminal investigation, which then led to the decision by various PBMs to terminate Oldsmar. Thus, when the defendant agreed to sell prescriptions to Conspirator #4 (in *this* conspiracy), they both understood that Conspirator #4 had to conceal his ownership in the pharmacy – A-Pharmacy – that would bill the PBMs for those prescriptions. As such, the defendant knew that Conspirator #4 concealed his ownership of A-Pharmacy for the purpose of deceiving the PBMs.

5.     As to the scheme contemplated by Count Two: In support of the defendant's guilty plea, USDOJ-CPB and the defendant agree and stipulate to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and USDOJ-CPB retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

(a)     Between July 1, 2017 and August 1, 2018, the defendant, in addition to its telemedicine components, was also in the business of marketing and selling numerous consumer products, including weight-loss pills, skin creams, and testosterone supplements (collectively, "consumer products"). Officers and employees of the defendant knowingly drafted marketing materials; arranged for distribution of the materials; supervised others who managed a telemarketing call-center in Largo, Florida; directed the training of telemarketers on sales tactics

and the use of sales scripts; and used various domestic and international corporate entities to process credit card transactions.

(b)  As part of the defendant's telemarketing operations, the defendant's officers and employees knowingly and willfully devised call scripts that were designed to deceive consumers, in that they contained claims that were materially false, misleading, and omitted material information that induced consumers to allow credit card charges to the defendant, for the financial benefit of the defendant.

(c)  For example, the defendant's telemarketers made numerous false and deceptive claims to consumers about a variety of consumer products they sold. These claims included the following:

(i)  Telemarketers falsely claimed that a product called "Pure Garcinia Cambogia" would "prevent[] fat from being made" and "increase[] serotonin levels which helps you feel fuller longer, helps maintain healthy stress hormone cortisol that can decrease belly and thigh fat and most importantly it's all natural and stimulant free weight loss with no known side effects."

(ii)  Telemarketers falsely claimed that "Flawless Youth Skintensive Xcel," ("Flawless Youth") "uses a clinically proven formula that features acetyl hexapeptide 8, a material that mimics the effect on deep wrinkles of Botox."

(d)  The defendant's officers and employees knowingly trained telemarketers to dissuade consumers from doing independent research on the products for fear they would discover the false claims in the call scripts. When consumers told telemarketers that they wanted to conduct further research, telemarketers would falsely tell consumers "I am the best resource

Page 20 of 33

for your research. I can give you more information and more specific responses to the questions you need answered than a website. Our product is 100% natural. I have all the ingredients here!"

(e)     The defendant's sales scripts for many of its products lured consumers into purchasing products, falsely assuring them that their purchases were risk-free and promising excellent customer service.

(f)     Telemarketers took consumers' credit card information to cover what they described as minor "shipping costs" for the initial shipment, and then telemarketers enrolled consumers into a subscription for the product that would bill their credit cards for the consumer products on a monthly basis. Telemarketers deceptively assured consumers that the monthly enrollment was "risk free," and if for any reason they wanted to avoid that monthly charge, they simply needed to call the defendant's customer service department, and upon speaking with those representatives, they could receive a full refund. Telemarketers also deceptively assured consumers that they could cancel the subscription at any time. These claims of excellent customer service, ease of returns, and subscription cancellations were false.

(g)     In fact, the defendant's customer service was primarily an arm of its telemarketing force. Customers calling to cancel or demand refunds were not called back, put on hold, stalled, and, on the occasions that consumers did speak to someone in the defendant's customer service group, they otherwise were run through a gauntlet of scripted rebuttals that used many similar deceptive or unfounded claims that the defendant's telemarketers used to market the products in the first place. For example, the defendant's customer service representatives would deceptively convince consumers demanding returns that "the product is said to work best over time, and was sold to you at a highly discounted rate. This is a one-time purchase, but you can always call back to reorder for the same low price. <Product Name> offers

a full 30-day satisfaction guarantee to give you enough time to try the product and begin to see the results, OK?" Telemarketers also concealed the defendant's corporate identity, identifying themselves as calling on behalf of the brand themselves, for example, "Hi. This is _____ calling on behalf of Pure Garcinia Cambogia," never providing the defendant's name specifically. While telemarketers did provide customer service numbers, the defendant used over 20 service numbers for their products, causing confusion for consumers persistent enough to continue the refund process. Often, even after consumers returned the products and were promised refunds, they still incurred charges from the defendant.

(h)     The defendant's telemarketers falsely promised consumers that the company would protect their personal and credit card information. In a scripted rebuttal to consumer concerns entitled "I don't give my card over the phone-credibility," the defendant's telemarketers would falsely state "I understand EXACTLY where you are coming from but the bank that approved you for that credit card would investigate the authenticity of this offer for you immediately!" Telemarketers convinced consumers that the defendant "would NEVER jeopardize our privilege to charge credit cards as our normal way of doing business over a couple of dollars. You're in GREAT hands, so which card are you using today? Visa MasterCard or Discover?" In fact, the defendant did not properly ensure the security of its servers or the information on it, which resulted in at least one security breach that exposed consumers' credit card information to outside parties.

(i)     The defendant's officers and employees were aware of consumer complaints about, and returns of, the products it sold, and were also aware that the defendant experienced a high rate of credit card chargebacks. In spite of these consumer complaints, the defendant never took steps to investigate consumer complaints or alter its business model.

(j)     Because the defendant routinely sold products to thousands of consumers each month, chargebacks on those sales often exceeded numerical caps set by financial institutions. In order to minimize the risk of chargebacks to the defendant's consumer products telemarketing business, the defendant's officers and employees established a series of corporate entities, each of which was assigned a separate credit card merchant identification number ("MID") through which the defendant passed payments and chargebacks. In cases where chargebacks exceeded or risked exceeding a relevant numerical cap, the defendant's officers and employees moved payment settlements from one MID to another. This diffused the risk that chargebacks in a given time period would reach or exceed a number that might result in financial institutions halting settlements, prolonging the defendant's ability to work with financial institutions. This, in turn, allowed the defendant's ability to charge consumer credit cards to continue.

6.     The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

(a)     the right to have his case presented to a grand jury for these crimes;

(b)     the right to plead not guilty;

(c)     the right to a speedy and public trial by jury;

(d)     the right to assistance of counsel at trial;

(e)     the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

(f)     the right to confront and cross-examine witnesses against the defendant;

Case 2:18-cr-00133-JRG-MCLC *SEALED* Document 8 *SEALED* Filed 09/24/18 Page 23 of 33 PageID #: 94
Case 2:18-cr-00140-JRG-CRW Document 229-1 Filed 07/02/20 Page 58 of 72 PageID #: 3006

(g)     the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

(h)     the right not to testify and to have that choice not used against the defendant.

7.      The parties agree that the appropriate disposition of this case would be the following as to each count:

(a)     The Court may impose any lawful terms of probation and any lawful fines up to the statutory maximums.

(b)     The Court will impose special assessment fees as required by law; and

(c)     The Court may order forfeiture as applicable and restitution as contemplated by paragraph 10.

(d)     No promises have been made by any representative of USATNE or USDOJ-CPB to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this agreement or withdraw the defendant's guilty plea. The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 8 *SEALED*   Filed 09/24/18   Page 24 of 33   PageID #: 95
Case 2:18-cr-00140-JRG-CRW   Document 223-1   Filed 07/02/20   Page 59 of 72   PageID #: 3007

(e)     Pursuant to Rule 11(c)(1)(B), and in consideration of the terms of this plea agreement and the relevant policy statements and related commentary, USATNE and USDOJ-CPB agree to recommend at the time of sentencing that pursuant to U.S.S.G. § 8C2.2(b), no precise determination of the guideline fine range is required because it is readily ascertainable that the defendant cannot and is not likely to become able to pay the minimum of the guideline fine range. The defendant understands and agrees that the recommendation set forth in this paragraph is made pursuant to Rule 11(c)(1)(B) and, as such, is not binding on the Court. The defendant further understands and agrees that if the recommendation set forth in this paragraph is rejected by the Court, such rejection may not be used by the defendant as a basis to rescind this plea agreement or withdraw the defendant's guilty plea.

8.      Given the defendant's agreement to plead guilty, USATNE and USDOJ-CPB will not oppose a two-level reduction for acceptance of responsibility under the provisions of § 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to § 3E1.1(a), USATNE and USDOJ-CPB agree, at or before the time of sentencing, to move the Court to decrease the offense level by one additional level pursuant to § 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense, including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, USATNE and USDOJ-CPB will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines.

9.     The defendant agrees to pay the special assessment in this case prior to sentencing.

10.     The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for the losses caused to the victims of the offenses set forth in the Information relating to this agreement. Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties agree to recommend that the defendant be responsible, jointly and severally with Scott Roix, for restitution in an amount of $5,000,000, to be paid to the victims in this case, *i.e.*, the health care benefit programs. This amount reflects the defendant's role in the conspiracy and the defendant's lesser culpability relative to other responsible parties (as described in this plea agreement and underlying Information). In accordance with this stipulation, the parties agree, pursuant to 18 U.S.C. § 3664(h) to recommend to the Court that the defendant be held jointly and severally liable with Scott Roix for restitution of $5,000,000. The parties understand and agree that the total restitution[3] in this case will also be owed by others mentioned in this Plea Agreement and the Information, including the defendant.

11.     In addition to restitution in this criminal case, the defendant may ultimately pay damages and penalties pursuant to a settlement in a parallel Federal civil proceeding with USATNE. The parties agree that any amounts paid by or on behalf of the defendant or Scott Roix in the parallel Federal civil proceeding for the same loss (but not including amounts paid for penalties relating to any amounts paid for loss) to any of the same victims of the same offenses as the criminal case should offset the defendant's criminal restitution, in accordance

---

[3] The total amount of restitution to be owed to the victims in this and the related cases is not fully known at the time of the signing of this plea agreement. In part, this is a result of the sheer number of health care benefit programs that suffered losses. The parties anticipate, however, that the full amount, and the apportionment of the full amount of restitution will be known at the time of sentencing in this case and the related cases.

with 18 U.S.C. § 3664(j)(2). USATNE shall provide to the Clerk of the Court the amounts paid to any parallel victims for the same loss, so that the Clerk of the Court may reduce the balance of the defendant's restitution accordingly.

12.     The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately, the defendant agrees that Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a nominee or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

(a)     If so requested by USATNE or USDOJ-CPB, the defendant will promptly submit a completed financial statement to USATNE and USDOJ-CPB, in a form it or they provide and as it or they direct. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

(b)     The defendant expressly authorizes USATNE and USDOJ-CPB to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

(c)     If so requested by USATNE or USDOJ-CPB, the defendant will promptly execute authorizations on forms provided by USATNE and USDOJ-CPB to permit USATNE and USDOJ-CPB to obtain financial and tax records of the defendant.

13.     The defendant understands that if the defendant holds any regulatory licenses or permits, or is contracted with any federal, state, or local governmental entity, the conviction in this case may result in the suspension or revocation of those licenses and permits or the termination of those contracts. The defendant understands that the defendant may not use anticipated or unanticipated collateral consequences such as these as a basis for withdrawing the defendant's guilty plea.

14.     Upon receiving written notice from USATNE or USDOJ-CPB, but in any event not before October 10, 2018, the defendant shall make the information and this plea agreement conspicuously available to the public on its website for four (4) years after receipt of such notice, and to communicate to all of defendant's employees that it has entered into this agreement and make available the information and this agreement.

15.     This agreement shall bind the defendant, its successor entities (if any), parent companies, and any other person or entity that assumes the liabilities contained herein ("successors-in-interest"). The defendant, or its successors-in-interest, if applicable, shall provide USATNE and USDOJ-CPB with immediate notice of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action affecting the defendant's ability to pay any fine ordered by the Court or affecting this agreement. No change

in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter the defendant's responsibilities under this agreement. The defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this agreement. If such transaction or series of transactions has the effect of circumventing or frustrating the purposes of this agreement, as determined in the sole discretion of USATNE or USDOJ-CPB, it shall be deemed a breach of this agreement.

16.     The defendant acknowledges that the principal benefits to USATNE and USDOJ-CPB of this agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by USATNE and USDOJ-CPB in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense committed, the defendant voluntarily, knowingly, and intentionally agrees to the following:

(a)     The defendant will not file a direct appeal of the defendant's conviction or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

(b)     The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

(c)     The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

17.     This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. The defendant's signature on this plea agreement constitutes the defendant's admission that the facts contained herein are true and accurate. If USATNE or USDOJ-CPB violate the terms of this agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this agreement in any way (including, without limitation, by failing to enter a guilty plea as agreed herein, moving to withdraw guilty plea after entry, or by violating any court order or any local, state, or federal law pending the resolution of this case), then USATNE or USDOJ-CPB will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, USATNE or USDOJ-CPB may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges that USATNE and USDOJ-CPB agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to prosecution for the conduct contemplated by this agreement. The defendant also understands and agrees that a violation of this agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea in this case.

18.     The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even

Case 2:18-cr-00133-JRG-MCLC *SEALED*   Document 8 *SEALED*   Filed 09/24/18   Page 30 of 33   PageID #: 101
Case 2:18-cr-00140-JRG-CRW   Document 223-1   Filed 07/02/20   Page 65 of 72   PageID #: 3013

though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

19.     This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charges, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

* * * * *

Case 2:18-cr-00133-JRG-MCLC *SEALED* Document 8 *SEALED* Filed 09/24/18 Page 31 of 33 PageID #: 102
Case 2:18-cr-00140-JRG-CRW Document 223-1 Filed 07/02/20 Page 66 of 72 PageID #: 3014

J. Douglas Overbey
United States Attorney

**As to Count One for USATNE:**

By: _[signature]_
Timothy C. Harker
Assistant United States Attorney

By: _[signature]_
David L. Gunn
Assistant United States Attorney

By: _[signature]_ w/ permission
Anne-Marie Svolto
Assistant United States Attorney

**As to Count Two for USDOJ-CPB:**

_[signature]_
John Claud
USDOJ Trial Attorney

**As to Counts One and Two for the Defendant:**

_[signature]_
Scott G. Roix
Duly Authorized Representative of
the defendant HealthRight LLC

_[signature]_
Michael Diamondstein
Attorney for the defendant HealthRight LLC

_[signature]_
Hugh Ward
Attorney for the defendant HealthRight LLC

_9/24/2018_
Date

_9/24/2018_
Date

_9/24/2018_
Date

_9/24/2018_
Date

_9-24-18_
Date

_September 24, 2018_
Date

_September 24, 2018_
Date

Signature Page to HealthRight LLC Plea Agreement

<u>Certification of the Defendant</u>

I have been duly authorized according to the bylaws and relevant organizational documents of the defendant HealthRight LLC ("the defendant") to enter into this agreement on behalf of the defendant. I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with the defendant's attorney. I understand the terms of this agreement, and I voluntarily agree to those terms on behalf of the defendant. I have discussed the evidence with the defendant's attorney, and defendant's attorney has advised me of defendant's rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me or to the defendant other than those contained in this agreement. No one has threatened or forced me or the defendant in any way to enter into this agreement. I am satisfied with the representation of the defendant's attorney in this matter, and I am pleading guilty on behalf of the defendant because the defendant is guilty of the charge and wishes to take advantage of the promises set forth in this agreement, and not for any other reason.

9-24-18
_____
Date

_____
Scott G. Roix
Duly Authorized Representative of
the defendant HealthRight LLC

Certification Page to HealthRight LLC Plea Agreement



SEP 2 6 2018

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA ) No. 2:18-CR-133
) Judge Greer
v. )
) **FILED UNDER SEAL**
HEALTHRIGHT LLC )

## PLEA AGREEMENT SUPPLEMENT

The parties agree that the following additional terms are part of the Plea Agreement in the above-captioned case:

1.      The defendant further agrees to cooperate fully, completely, and truthfully with any and all law enforcement agents and personnel of the United States Attorney's Office. This cooperation includes, but is not limited to, a duly authorized representative meeting with and being interviewed by such law enforcement agents or personnel of the United States Attorney's Office whenever requested. The defendant further agrees not to protect anyone who was truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses. The defendant further agrees that a duly authorized representative will testify completely and truthfully before a grand jury, at any trial, or at any other proceeding if called upon by the United States to do so. Upon request by the United States, the defendant must furnish all documents, objects and other evidence in the defendant's possession, custody, or control that are relevant to the United States' inquiries. The defendant and defense counsel also knowingly, voluntarily, and intentionally waive the defendant's right (where applicable) to have defense counsel present during the course of cooperation, including questioning or court appearances.

2.     To ensure the defendant's truthful cooperation, the United States agrees, except as provided below, not to use any self-incriminating information provided by the defendant pursuant to this written plea agreement against the defendant. However, nothing in this plea agreement shall restrict the use of any information (1) known to the United States prior to entering into this written plea agreement, (2) obtained from any other source, or (3) concerning the defendant's prior criminal record. Should any of the following occur (1) the defendant provides false or misleading information during the course of the defendant's cooperation, (2) the defendant moves to withdraw the defendant's guilty plea, or (3) the defendant breaches any other of the terms of this plea agreement, then the United States may make use of any information provided by the defendant to law enforcement authorities at any time (including any information provided during formal or informal proffer sessions prior to signing this plea agreement, and any information provided after signing this plea agreement) for any purpose in any subsequent proceeding, including grand jury, trial, and sentencing phases of this case or in any other prosecutions or proceedings against the defendant or others. Moreover, if the United States determines at any time (before or after sentencing) that the defendant has failed to cooperate fully, completely, and truthfully, or otherwise violated any of the terms of this plea agreement, it will be free to withdraw any favorable sentencing motion filed by the United States, including motions filed under U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553.

3.     At the time of sentencing, the United States may bring to the Court's attention the nature, extent, and value of the defendant's cooperation so that it may be considered in determining a fair and appropriate sentence under the facts of the case.

J. Douglas Overbey
United States Attorney

**As to Count One for USATNE:**

By: _[signature]_

Date _9/26/2018_

Timothy C. Harker
Assistant United States Attorney

By: _[signature]_

Date _9/24/2018_

David L. Gunn
Assistant United States Attorney

By: _TCH for Anne-Marie Svolto w/ permission_

Date _9/26/2018_

Anne-Marie Svolto
Assistant United States Attorney

**As to Count Two for USDOJ-CPB:**

_[signature]_

Date _9/24/18_

John Claud
USDOJ Trial Attorney

**As to Counts One and Two for the Defendant:**

_[signature]_

Date _9-24-18_

Scott G. Roix
Duly Authorized Representative of
the defendant HealthRight LLC

_[signature]_

Date _September 24, 2018_

Michael Diamondstein
Attorney for the defendant HealthRight LLC

_[signature]_

Date _September 24, 2018_

Hugh Ward
Attorney for the defendant HealthRight LLC

## Certification of the Defendant

I have been duly authorized according to the bylaws and relevant organizational documents of the defendant HealthRight LLC ("the defendant") to enter into this agreement on behalf of the defendant. I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with the defendant's attorney. I understand the terms of this agreement, and I voluntarily agree to those terms on behalf of the defendant. I have discussed the evidence with the defendant's attorney, and defendant's attorney has advised me of defendant's rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me or to the defendant other than those contained in this agreement. No one has threatened or forced me or the defendant in any way to enter into this agreement. I am satisfied with the representation of the defendant's attorney in this matter, and I am pleading guilty on behalf of the defendant because the defendant is guilty of the charge and wishes to take advantage of the promises set forth in this agreement, and not for any other reason.

9-24-18
Date

Scott G. Roix
Duly Authorized Representative of
the defendant HealthRight LLC